UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANDREA LORRAINE MYERS,

      Plaintiff,                Civil Action No. 15-12873

           v.                District Judge MARIANNE O. BATTANI
                            Magistrate Judge R. STEVEN WHALEN

COMMISSIONER OF SOCIAL
SECURITY,

      Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Andrea Lorraine Myers ("Plaintiff") brings this action under 42 U.S.C. §405(g), challenging a final decision of Defendant Commissioner denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act. The parties have filed cross-motions for summary judgment. Both motions have been referred for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B). For the reasons discussed below, I recommend that Plaintiff's Motion for Summary Judgment [Docket #15] be GRANTED to the extent that the case is remanded for further administrative proceedings consistent with this Report, and that Defendant's Motion for Summary Judgment [Docket #19] be DENIED.

-1-

## PROCEDURAL HISTORY

On August 27, 2012, Plaintiff applied for DIB and SSI, alleging disability as of August 24, 2012 (Tr. 124, 131). Following the initial denial of benefits, Plaintiff requested an administrative hearing, held on March 13, 2014 in Oak Park, Michigan (Tr. 21). J. William Callahan, Administrative Law Judge ("ALJ") presided. Plaintiff, represented by attorney Patrick Ebner, testified (Tr. 24-42), as did Vocational Expert ("VE") Michael Roscoe (Tr. 42-48). On March 28, 2014, ALJ Callahan found Plaintiff not disabled (Tr. 9-16). On June 12, 2015, the Appeals Council denied review (Tr. 1-3). Plaintiff filed suit in this Court on August 13, 2015.

## BACKGROUND FACTS

Plaintiff, born September 13, 1978, was 35 when ALJ Callahan issued his decision (Tr. 16, 124). She completed one year of college and received training in phlebotomy (Tr. 188). She worked previously as a cashier, customer service representative, direct care worker, photographer, physical therapy technician, and property manager (Tr. 189). Her application for benefits alleges disability as a result of multiple sclerosis ("MS"), bipolar disorder, depression, anxiety, chronic pain, spasms, blurry vision, extremity numbness, memory loss, cognitive loss, difficulty walking, back problems, and bowel and urinary track problems (Tr. 187).

### A.     Plaintiff's Testimony

Plaintiff offered the following testimony.

Plaintiff lived in Roseville, Michigan in a three-bedroom ranch with her mother and infant son(Tr. 24-25, 28-29). She and her son's father performed care giving activities for her son (Tr. 29). During her college stint, Plaintiff took photography, psychology, and English courses (Tr. 26). She owned a car and was able to drive (Tr. 26).

Plaintiff worked for 10 years as a photographer (Tr. 27). Her last job prior to becoming disabled was in August, 2012 at which time she was working as a property manager at a storage facility (Tr. 27). The property manager position required her to clean out storage units, perform managerial tasks, and remove snow (Tr. 27). The position required her to lift up to 50 pounds (Tr. 28). Before that, she worked for one week in a medical records department, but was discharged because she was going through a "manic" phase of bipolar disorder (Tr. 29-30). In 2010, she worked as a direct care giver for mentally disabled adults and as a stocker/cashier (Tr. 31). She also worked as a customer service representative/cashier for a shoe store (Tr. 32). In 2005, she worked as a physical therapist technician, requiring her to assist patients with their exercises (Tr. 30). She currently had no income, but her mother gave her $100 every two weeks to pay for credit card bills (Tr. 28).

Plaintiff currently experienced MS, bipolar disorder, and back pain (Tr. 32). She received chiropractic treatment for the back problems since undergoing back surgery in 2005 (Tr. 32). She received psychiatric treatment and medication for MS (Tr. 33). She took Lithium, Celexa, and Klonopin for bipolar disorder, and tizanidine and a daily injection of Copaxone for MS (Tr. 34). She experienced the side effect of fatigue from Lithium (Tr. 35).

-3-

She had been taking Lithium since she was 17 (Tr. 35). She stopped taking Copaxone when she was pregnant (Tr. 35). MS caused gait instability and right side weakness (Tr. 37). She experienced regular fatigue and was unable to stand for long periods (Tr. 38).

On a typical day before the birth of her son, Plaintiff would eat breakfast, perform housekeeping chores, go to her grandmother's house and help her with housekeeping chores, eat dinner, watch television, and go to bed (Tr. 36). Plaintiff's days were now spent feeding, dressing, and caring for the baby (Tr. 37).

In response to questioning by her attorney, Plaintiff reported that she experienced occasional left-side vision problems characterized by "foggy" vision, black spots, or a complete loss of vision (Tr. 39). At times she experienced a complete loss of right-sided vision, and she wore an eye patch to allow her to focus with her left eye (Tr. 41-42). The vision problems occurred during MS flare-ups, which were treated with multiple day hospitalizations and steroids (Tr. 39). She was unable to perform any physical work for more than 30 minutes at a time (Tr. 39). Before her child was born, she typically napped one to two hours a day (Tr. 40). On approximately 15 days of the month, she was capable of lifting 30 pounds on an occasional basis but on the other 15, right-sided weakness prevented her from lifting significant amounts (Tr. 40). She reiterated that her mother and her son's father helped care for the son on a daily basis (Tr. 41).

### B.      Medical Evidence

### 1. Treating Sources

August, 2006 psychiatric evaluation by Easter Seals of Southeastern Michigan note Plaintiff's history of manic episodes which were currently stabilized with medication[1] (Tr. 440).  A May, 2011 psycho-social assessment note Plaintiff's history of bipolar disorder treated with Lithium and Plaintiff's report that she currently lived with her boyfriend and worked part time (Tr. 306).  She reported "least 13 psychiatric hospitalizations" in the past, noting that the most recent episode was in 2007 (Tr. 306).  She attributed her current stability to taking her medication and learning to cope with stress (Tr. 306).  Her depression was rated "mild to moderate in nature" (Tr. 310).  She was assigned a GAF of 81[2] (Tr. 311). Psychiatric records from the following month note a GAF of 60[3] (Tr. 348).  The following month, Plaintiff reported "poor appetite, racing thoughts, mismanaging . . . money, and insomnia" when not on psychotropic medication (Tr. 350).

In January, 2012, Plaintiff reported an improved mood after taking Celexa (Tr. 336).

---

[1]Records significantly predating the alleged onset of disability are included for background purposes only.

[2]

GAF scores in the range of 81–90 indicate "absent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns." *American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders–Text Revision* (4th ed.2000) at 34 ("*DSM–IV Manual*").

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *DSM-IV-TR* at 34.

An April, 2012 emergency spinal tap taken in response to blurry left eye vision, facial numbness, and generalized weakness was consistent with "demyelinating disorders"[4] (Tr. 231,236, 241, 243, 256).  A CT of the head was consistent with MS (Tr. 254-255, 275, 601). An MRI of the brain taken the same day was also consistent with a diagnosis of MS (Tr. 253, 273, 599).   The following month, an MRI of the cervical and thoracic spine showed similar results (Tr. 224, 596-597).  The same month,  Jean Marie R. Pierre, M.D. noted Plaintiff's report of long-term headaches and fatigue (Tr. 261).  In June, 2012, Plaintiff again reported vision problems as well as neck and head pain (Tr. 215).

The following month, neurologist Anne M. Pawlak, D.O. examined Plaintiff, noting Plaintiff's report that she was regaining her vision but experienced finger and toe numbness, right leg dragging, memory problems, and incontinence (Tr. 279, 292).  She noted that the imagining studies and clinical testing were consistent with a diagnosis of MS (Tr. 282). Psychiatric records from the same month state that Plaintiff was "depressed and tearful" about the MS diagnosis (Tr. 325).  In August, 2012 ophthalmologist Michael S. Sherman, D.O. noted that a recent eye examination showed optic neuritis attributable to MS (Tr. 287). Dr. Pawlak's notes from the same month  state that the symptoms of MS were exacerbated by the sudden death of her brother (Tr. 297).  The same month, Plaintiff sought treatment for symptoms of Carpal Tunnel Syndrome ("CTS") (Tr. 303).  Psychiatric notes state that

---

[4]"MS is the most common demyelinating disease." http://www.healthline.com /health/multiple-sclerosis/demyelination#Types4 (last visited February 4, 2016).

Plaintiff was anxious and upset due to the death of her brother but was able to handle the tragedy "fairly well" (Tr. 315). Records from the same month by Henry Ford Macomb note that Plaintiff reported that "she may need to change jobs because the driving distance is too far . . ." (Tr. 464). She reported working as a property manager on a full-time basis (Tr. 467). Treatment notes state that she was experiencing stress and "situational problems" including her brother's death and the diagnosis of MS (Tr. 469).

October, 2012 psychiatric evaluation records state that Plaintiff now lived with her mother and that she had quit her job as a property manager because of the physical strain (Tr. 373, 386, 414, 527). She demonstrated a normal mood and good judgment, impulse control, and insight and reported good sleep habits and appetite (Tr. 388, 543). Howard Gofstein, MA, assigned her a GAF of 52 due to housing, occupational, healthcare, and environmental problems (Tr. 395, 418, 550). December, 2012 medication review notes state that Plaintiff denied medication side effects but was sleeping 10 hours a day and experienced fatigue due to MS (Tr. 517).

A January, 2013 medication review states that MS symptoms were "less severe" (Tr. 509). A March, 2013 medication review states that Plaintiff was "doing well" (Tr. 500). A May, 2013 EEG showed right eye optic neuritis and probable mild left optic neuritis (Tr. 476). The same month, imagining studies showed neurological abnormalities of the bilateral lower extremities, worse on the right (Tr. 478). Imaging studies of the brain stem and bilateral wrists were unremarkable (Tr. 480-482). A July medication review states that

-7-

Plaintiff stopped taking psychotropic drugs due to her pregnancy (Tr. 490). In September, 2013, neurologist Sham S. Moudgil, M.D. examined Plaintiff, noting that symptoms of MS had waned during her pregnancy (Tr. 485). She exhibited a normal gait (Tr. 485). A January, 2014 MRI of the brain was consistent with a diagnosis of MS (Tr. 603). An MRI of the cervical spine taken the following month showed "multiple sclerosis lesions" on the cervical cord but no suggestion of "active demyelination" (Tr. 605). An MRI of the thoracic spine showed a small disc protrusion at T3/T4 with an abnormal spinal cord signal intensity due to MS (Tr. 606-607).

## 2. Non-Treating Sources

In November, 2012, Jose Mari G. Jurado, M.D. performed a consultative physical examination, noting Plaintiff's report of fatigue, dizziness, weakness, cognitive issues, night blindness, and incontinence (Tr. 398). Dr. Jurado noted that Plaintiff could ambulate without a cane but experienced right leg shaking (Tr. 400). He noted that her ability to "bend, stoop, carry, push and pull" were "somewhat limited due to fatigue. He found that Plaintiff was limited in the ability to carry "moderate to heavy loads" for sustained periods due to right leg weakness and fatigue "consistent with . . . suspected multiple sclerosis" (Tr. 400).

The same month, Tariq Mahmoud, M.D. performed a non-examining physical assessment on behalf of the SSA, finding that Plaintiff was capable of lifting 20 pounds occasionally and 10 frequently; sitting, standing, or walking for eight hours in an eight-hour workday; and unlimited pushing and pulling (Tr. 59). He found that Plaintiff was capable

of frequent balancing and other postural activities on an occasional basis (Tr. 59). He found that Plaintiff did not experience visual limitations (Tr. 60). In January, 2013, Dyan Hampton-Aitch, Ph.D. completed a non-examining psychological assessment of the treating records, finding that Plaintiff experienced mild restriction in activities of daily living and moderate limitation in social functioning and concentration, persistence, or pace (Tr. 57).

In January, 2014, Ernesto Bedia, M.D. performed a consultative physical examination on behalf of the SSA, noting Plaintiff's report of blurred left eye vision, and incontinence (Tr. 557). Dr. Bedia noted a steady gait, full muscle strength, and an unremarkable neurological evaluation (Tr. 559). Dr. Bedia also completed an assessment of Plaintiff's work-related activities, finding that she could lift up to 10 pounds frequently and 20 occasionally; sit for four hours, stand for three, and walk for two in an eight-hour workday; and push and pull frequently (Tr. 564-566). He found that Plaintiff was capable of frequent bilateral manipulative activitities (Tr. 566). He found that she could stoop, kneel, crouch, crawl, and climb stairs and ramps on an occasional basis; balance frequently; and was precluded from all climbing of ladders or scaffolds (Tr. 567). Dr. Bedia noted a visional limitation but found that it did not prevent Plaintiff from avoiding hazards, reading, or discerning shapes (Tr. 567). He found that Plaintiff was limited to frequent exposure to humidity, dust, vibration, loud noises; occasional exposure to moving mechanical parts and temperature extremes; and was precluded from unprotected heights (Tr. 568).

The same day, psychologist Julia A. Czarnecki performed a psychological evaluation

on behalf of the SSA, noting Plaintiff's history of bipolar disorder and report of a full

remission of MS (Tr. 571). Czarnecki noted an appropriate mood and affect (Tr. 573). She

noted that Plaintiff did not exhibit psychiatric symptoms or concentrational deficiencies,

concluding that Plaintiff could work "at a sustained pace" (Tr. 574). Czarnecki also

completed a work-related abilities assessment, finding that Plaintiff did not experience any

degree of psychological or cognitive limitation (Tr. 575). Czarnecki noted that Plaintiff

experienced concentrational limitations only during "MS episodes" which were currently in

remission (Tr. 575).

### C. Vocational Expert Testimony

VE Michael Roscoe classified Plaintiff's past job as a cashier as semiskilled and

exertionally light (medium as performed);[5] care giver, semiskilled/medium (heavy as

performed); photographer, skilled/light (heavy as performed); shoe store sales associate,

semiskilled/light; physical therapy aide, semiskilled/medium; and property storage worker,

unskilled/light (medium as performed) (Tr. 44). He stated that her testimony would be

---

[5]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds
at a time and occasionally lifting or carrying articles like docket files, ledgers, and small
tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying
of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at
a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that
exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent
lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting
objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects
weighing 50 pounds or more. § 404.1567(e).

consistent with the information found in the *Dictionary of Occupational Titles* ("DOT") and that he would advise the ALJ of any conflicts with DOT "and the basis of [his] opinion" (Tr. 43). The VE stated that if Plaintiff were limited to "simple, routine, repetitive tasks," she would be unable to perform any of her past relevant work (Tr. 44). ALJ Callahan then posed the following question to the VE, describing a hypothetical individual of Plaintiff's age, education, and work experience with the following limitations:

> [L]imited to light work and only occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching or crawling, and no climbing ladders, ropes or scaffolding(Tr. 65).

The VE testified that the limitations would allow the individual to perform the past relevant work as a photographer, customer service associate, and property storage worker as the jobs were typically performed in the national economy (Tr. 45). He found that the additional restriction of binocular vision with "no depth perception" would preclude the work as a photographer, but allow for the work of a customer service associate and property storage worker (Tr. 45).

The VE found further that if the same individual were additionally limited to sedentary work with "simple job assignments and "simple routine, repetitive tasks and capable of performing high production assignments," she could perform the work of an assembler, sorter, or product finisher (3,600 jobs in the State of Michigan), and parking facility cashier (1,000) (Tr. 46). The VE noted that a restriction to binocular vision would not change the job numbers but that a limitation to only "incidental interaction" with the

-11-

general public would eliminate the cashier position (Tr. 46-47). He testified that the need to be off task for more than 10 percent of the workday would preclude all work (Tr. 47).

### D. The ALJ's Decision

Citing Plaintiff's medical records, ALJ Callahan found the severe impairments of "relapsing/remitting [MS], episodes of optic neuritis, and bipolar I disorder with symptoms of depression" but that none of the conditions met or medically equaled any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 11). He found that Plaintiff had mild restriction in activities of daily living and social functioning and moderate difficulty in concentration, persistence, or pace (Tr. 14). The ALJ found that Plaintiff retained the residual functional capacity ("RFC") for light work with the following additional limitations:

> [Limited to] occasional ramps and stairs, no use of ropes, ladders, or scaffolds, no work at unprotected heights, and only occasional balancing, stooping, kneeling, crouching or crawling (Tr. 12).

Citing the VE's testimony, the ALJ found that Plaintiff could return to her past relevant work as a photographer, customer service merchandiser, and property manager as "actually and generally performed" (Tr. 15).

The ALJ discounted Plaintiff's allegations of limitation. He noted that Plaintiff's "long history of bipolar disorder" did not prevent her from working prior to the alleged onset of disability (Tr. 15). He also observed that the history of bipolar disorder did not prevent Plaintiff from becoming engaged or having a baby (Tr. 15).

In regard to the condition of MS, he noted that despite intermittent lower extremity

-12-

weakness and vision problems, the symptoms did not prevent Plaintiff from working until August, 2012 (Tr. 15). He noted that Plaintiff's daily activities included preparing simple meals, performing household chores, riding a bicycle and attending church services (Tr. 13).

## **STANDARD OF REVIEW**

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. 42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence is more than a scintilla but less that a preponderance. It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

-13-

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof at steps one through four, but the burden shifts to the Commissioner at step five  to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984)

## ANALYSIS

Plaintiff makes three main arguments in favor of remand.  First, she contends that neither the hypothetical question to the VE nor the RFC reflect the ALJ's finding of moderate concentrational limitations. *Plaintiff's Brief,* 16-18,  *Docket #15*.  In her second argument, she argues that the ALJ did not provide a rationale for finding a lesser degree of limitation than the consultative and non-examining sources.  *Id.* at 19-22.  Third, she argues that the

-14-

ALJ's credibility determination was not supported by substantial evidence.

### A.  Internal Inconsistencies in the Administrative Decision

ALJ Callahan credited Plaintiff's allegations of intermittent concentrational deficiencies, finding that "bipolar I disorder with symptoms of depression" was a severe impairment and that she experienced "moderate" limitation in concentration, persistence, or pace ("CPP") (Tr. 11, 14).  However, neither the RFC nor the hypothetical question  reflect any degree of psychological limitation due to bipolar disorder, fatigue caused by MS, and/or medication side effects of Lithium (Tr. 11).  A hypothetical question forming the basis of the RFC constitutes substantial evidence only if it accurately portrays the individual's relevant impairments. *Varley v. Commissioner of Health and Human Services*, 820 F.2d 777, 779 (6th Cir.1987). While the Sixth Circuit has rejected the proposition that all of the claimant's maladies must be listed verbatim, "[t]he hypothetical question ... should include an accurate portrayal of [a claimant's] individual physical and mental impairments." *Webb v. Commissioner of Social Sec.,* 368 F.3d 629, 632 (6th Cir.2004).  A "moderate" limitation in CPP (representing the mid-point on a five-point scale of none, mild, moderate, marked, and extreme) implies the presence of at least some degree of limitation requiring mention in the question to the VE. 20 C.F.R. § 404.1520a(c)(4).  The failure to address moderate limitation in CPP may constitute reversible error.  *Edwards v. Barnhart*, 383 F.Supp.2d 920, 931 (E.D.Mich.2005)(hypothetical modifiers of "simple, unskilled, [and] routine," in some cases, not adequate to address moderatate limitation in CPP. . . . Plaintiff may be unable to meet

-15-

quotas, stay alert, or work at a consistent pace, even at a simple, unskilled, routine job"). While in *Edwards* the court found that the above-stated modifiers did not wholly address the moderate deficiencies, in this case, neither the hypothetical question forming the basis of the RFC, nor the RFC itself reflect *any* degree of psychological/cognitive limitation.

The ALJ's failure to acknowledge the moderate limitation in CPP in the RFC led to additional errors. Despite the moderate CPP finding, the ALJ found that Plaintiff could perform the past relevant (skilled) work as a photographer[6] (Tr. 15). To be sure, it is well established that moderate concentrational deficiencies do not preclude unskilled or in some cases, even semiskilled work, *Lewicki v. CSS.*, 2010 WL 3905375, *3 (E.D. Mich. Sept. 30, 2010)("moderate impairment in concentration, persistence, and pace does not necessarily preclude simple, routine, unskilled work"); *Schalk v. CSS.*, 2011 WL 4406824, *11 (E.D. Mich. Aug. 30, 2011)(unskilled work not inconsistent with moderate deficiencies in CPP); *Lang v. Astrue*, 2012 WL 4479157, *18 (E.D.Mich. August 10, 2012) (ability to perform a range of semiskilled work not automatically inconsistent with moderate deficiencies in CPP). However *skilled* work, by the SSA's own definition, is unavailable to individual experiencing moderate deficiencies in CPP:

> Skilled work requires qualifications in which a person uses judgment to
> determine the machine and manual operations to be performed in order to
> obtain the proper form, quality, or quantity of material to be produced. Skilled

---

[6]

The ALJ's finding that she could perform the photographer position "as performed" (at the exertionally heavy level) stands at odds with his finding that Plaintiff was limited to exertionally light work (12, 15, 44).

work may require laying out work, estimating quality, determining the suitability and needed quantities of materials, making precise measurements, reading blueprints or other specifications, or making necessary computations or mechanical adjustments to control or regulate the work. Other skilled jobs may require dealing with people, facts, or figures or abstract ideas at a high level of complexity. 20 C.F.R. § 404.1568.

The Court is unaware of any instance where moderate concentrational deficiencies allowed for the performance of skilled work.

The ALJ also found that Plaintiff was capable of her *semiskilled* former work as a customer service provider and cashier and *unskilled* work as a property manager. However, the VE testified in response to an alternative hypothetical question that if the individual were limited to "simple, routine repetitive tasks" (typically chosen modifiers where moderate CPP limitations exist) all of the former work (skilled, semiskilled, and unskilled) would be eliminated (Tr. 44). While the VE found that a range of other exertionally light work would be available to an individual limited to simple, routine, repetitive tasks, those findings assumed the ability to perform "high production assignments" generally inconsistent with moderate deficiencies in the pacing aspect of "concentration, persistence, and pace" (Tr. 45-46). *See Edwards, supra.* Moreover, the ALJ declined to adopt those job findings in the administrative opinion as an alternative to the finding that Plaintiff could perform her past relevant work.

An ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Lowery v. Commissioner, Social Sec. Administration,* 55 Fed.Appx. 333, 339, 2003 WL 236419, *5 (6th Cir. January 30, 2003);

*Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir.1995).  "To be entitled to substantial deference ... agency rulings must clearly articulate the rationale underlying the decision." *Bailey v. Commissioner of Social Sec.*, 173 F.3d 428, 1999 WL 96920, *3–4 (6th Cir. February 2, 1999) (*citing Hurst v. Secretary of Health & Human Servs.*, 753 F.2d 517, 519 (6th Cir.1985)).  Because the Court cannot reconcile the finding of moderate deficiencies in CPP and the finding that Plaintiff could perform her past relevant work, a remand for clarification of the Step Four findings is required.

### B.  Plaintiff's Other Arguments for Remand

Likewise, the ALJ did not provide a rationale for the physical limitations in the RFC. The ALJ's finding that Plaintiff was capable of light work with some degree of postural limitation is most similar to Dr. Mahmoud's December, 2012 non-examining finding that she could perform light work with similar (but not identical) postural limitations (Tr. 12, 59). However, nowhere in the opinion does the ALJ state that he is adopting the non-examining findings or provide reasons for rejecting the portion of the consultive findings by Drs. Jurado and Bedia reflecting a greater level of exertional and non-exertional limitation (Tr. 400, 564-566).  For example, the RFC does not address, much less adopt Dr. Jurado's observation that Plaintiff experienced right leg weakness, fatigue, and shaking (Tr. 400) or Dr. Bedia's finding that Plaintiff was incapable of the exertional demands of light work (Tr. 564-566). Admittedly, neither the consultative nor non-examining sources are entitled to any "special degree of deference." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).  However, given

that a consultative source is generally accorded "more weight" than a non-examining source, the ALJ's failure to provide a rationale for adopting a less restrictive non-examining source opinion over two consultative ones requires a remand for clarification. 20 C.F.R. § 404.1527 (b)(1). Although the ALJ appears to have adopted Dr. Hampton-Aitch's finding of moderate concentrational limitations, he provided no explanation for rejecting her finding of moderate social limitations (Tr. 57). While substantial evidence consisting of psychologist Czarnecki's January, 2014 mental evaluation arguably supports a lessor degree of psychological limitation, the Court can only speculate as to which of the medical sources were adopted, rejected, or adopted in part. For this reason as well, a remand for further clarification is required.

In contrast, I note that the ALJ's credibility determination, while succinct, is supported by substantial evidence (Tr. 15). "[A]n ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility.'" *Cruse v. CSS.,* 502 F.3d 532, 542 (6th Cir.2007) (*citing Walters v. CSS*, 127 F.3d 525, 531 (6th Cir.1997)); See also *Casey v. Secretary of Health and Human Services*, 987 F.2d 1230, 1234 (6th Cir.1993); *Anderson v. Bowen*, 868 F.2d 921, 927 (7th Cir.1989) (*citing Imani v. Heckler*, 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

In regard to the condition of MS, the ALJ permissibly observed that the symptoms of intermittent lower extremity weakness and visual problems did not prevent Plaintiff from

-19-

working full time (Tr. 15).   Indeed, while treating notes state that Plaintiff quit her property management job in August, 2012 due to "physical strain" (Tr. 373, 467), she testified that the management position required her to lift up to 50 pounds (Tr. 28); Plaintiff's inability to continue the property management work does not eliminate the possibility that she could perform a reduced range of light or sedentary work.   The ALJ also noted that the longstanding condition of bipolar disorder did not prevent Plaintiff from becoming engaged and having a baby[7] (Tr. 15).

Nonetheless, because the administrative opinion contains internal inconsistencies and the rationale for the RFC is not well articulated, a remand is required.   However, because it cannot be said that "all essential factual issues have been resolved," a remand for further fact-finding, rather than an award of benefits, is appropriate.   *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir.1994).   Upon remand, I recommend that the ALJ (1) elicit additional vocational testimony taking into account Plaintiff's moderate limitations in CPP, and, (2) provide a rationale for limitations found in the RFC.

---

[7]

The ALJ's credibility determination did not misstate or distort the record.   However, he appeared to rely in significant part on Dr. Bedia's January, 2014 consultative physical examination findings, taken in the ninth month of Plaintiff's pregnancy (Tr. 15).   It is unclear whether the ALJ considered Plaintiff's testimony that the condition of MS went into temporary remission due to the pregnancy, but approximately two weeks after giving birth, she experienced renewed leg dragging and right side weakness (Tr. 35-36).

## <u>CONCLUSION</u>

For these reasons, I recommend that Plaintiff's Motion for Summary Judgment [Docket #15] be GRANTED to the extent that the case is remanded for further administrative proceedings consistent with this Report, and that Defendant's Motion for Summary Judgment [Docket #19] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within 14 days of service of any objecting party's timely filed objections, the

opposing party may file a response.  The response shall be not more than twenty (20)

pages in length unless by motion and order such page limit is extended by the court.  The

response shall address specifically, and in the same order raised, each issue contained

within the objections.

                                        s/R. Steven Whalen
                                        R. STEVEN WHALEN
                                        UNITED STATES MAGISTRATE JUDGE

Date: September 27, 2016




                             CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was sent to parties of record on
September 27, 2016, electronically and/or by U.S. mail.


                                        s/Carolyn M. Ciesla
                                        Case Manager to the
                                        Honorable R. Steven Whalen